JUDGE NATHAN

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| Aimee MacCormac | ) ) ) ) |
| *Plaintiff(s)* | ) ) Civil Action No. 12 CV 5060 |
| v. | ) |
| Adam Klein, Daniel C. Stein, Dwight Tierney, and EMusic.com, Inc. | ) ) ) ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Phillips & Phillips
30 Broad St., 35th Floor
New York, NY 10004

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

RUBY J. KRAJICK

*CLERK OF COURT*

Date: JUN 28 2012

*Signature of Clerk or Deputy Clerk*

Adam Klein
39 West 13th Street
New York, NY 10011

Daniel C. Stein
39 West 13th Street
New York, NY 10011

Dwight Tierney
39 West 13th Street
New York, NY 10011

EMusic.com, Inc.
39 West 13th Street
New York, NY 10011

12 CV 5060

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

AIMEE MACCORMAC,

                              Plaintiff,

                -against-

ADAM KLEIN, *Individually*, DANIEL C. STEIN,
*Individually*,  DWIGHT TIERNEY, *Individually*,
and EMUSIC.COM, INC.,

                              Defendants.

-------------------------------------------------------------------X

Case No.

**COMPLAINT**

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

RECEIVED

JUN 28 2012

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff AIMEE MACCORMAC ("MACCORMAC"), by her attorneys, PHILLIPS &

PHILLIPS, Attorneys at Law, PLLC, hereby complains of the Defendants, upon information and

belief, as follows:

**NATURE OF THE CASE**

1.      Plaintiff MACCORMAC complains pursuant to Title VII of the Civil Rights Act of 1964,

        as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil

        Rights Act of 1991, Pub. L. No. 102-166 ("Title VII"), and the New York City Human

        Rights Law, New York City Administrative Code § 8-502(a), *et. seq.,* and seeks damages

        to redress the injuries she has suffered as a result of being **Sexually Harassed**,

        **Discriminated Against**, and **Retaliated Against** by her employer.

**JURISDICTION AND VENUE**

2.      Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. §§

        1331 and 1343.

3.      The Court has supplemental jurisdiction over the claims of Plaintiff brought under state law pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b) based upon Defendants' principal place of business within the Southern District of New York.

## PROCEDURAL PREREQUISITES

4.      Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunities Commission ("EEOC").

5.      Plaintiff received a Notice of Right to Sue from the EEOC, dated June 7, 2012, with respect to the herein charges of discrimination.  A copy of the Notice is annexed hereto.

6.      This Action is being commenced within 90 days of receipt of said Right to Sue.

## PARTIES

7.      That at all times relevant hereto, Plaintiff MACCORMAC was a resident of the State of New York and the County of Kings.

8.      That at all times relevant hereto, Defendant EMUSIC.COM, INC. ("EMUSIC") was and is a foreign business corporation, duly existing pursuant to, and by virtue of, the laws of the State of New York, with offices located at 39 West 13th Street, New York, NY 10011.

9.      That at all times relevant hereto, Defendant ADAM KLEIN ("KLEIN") was an employee of Defendant EMUSIC, holding the positions of "President" and "Chief Executive Officer."

10.     That at all times relevant hereto, Defendant KLEIN was Plaintiff MACCORMAC's supervisor and had supervisory authority over Plaintiff MACCORMAC.

11.     That at all times relevant hereto, Defendant DWIGHT TIERNEY ("TIERNEY") was an employee of Defendant EMUSIC, holding the position of "Chief Human Resources Officer."

12.     That at all times relevant hereto, Defendant TIERNEY had supervisory authority over Plaintiff MACCORMAC.

13.     That at all times relevant hereto, Defendant DANIEL C. STEIN ("STEIN") was an employee of Defendant EMUSIC, holding the positions of "Chairman" and "Director" and served as "Interim Chief Executive Officer" until in or about August 2010.

14.     That at all times relevant hereto, Defendant STEIN was Plaintiff MACCORMAC's supervisor and had supervisory authority over Plaintiff MACCORMAC.

15.     That at all times relevant hereto, Plaintiff MACCORMAC was an employee of Defendant EMUSIC.

16.     Defendant EMUSIC, Defendant KLEIN, Defendant STEIN, and Defendant TIERNEY are collectively referred to herein as "Defendants."

## MATERIAL FACTS

17.     From in or about 2006 through in or about 2007, Plaintiff MACCORMAC had worked for Defendants as a "Legal Consultant."

18.     On or about October 1, 2008, Plaintiff MACCORMAC began working for Defendant EMUSIC as a "Legal Affairs Specialist" in Defendants' Legal Department.

19.     At all times relevant hereto, Plaintiff MACCORMAC was an exemplary employee.

20.     Throughout her tenure with Defendants, Plaintiff MACCORMAC has always received compliments for her work performance and gets along well with all of her co-workers.

3

21.    In or about March 2010, as a result of her excellent work performance, Plaintiff MACCORMAC received a promotion to the position of "Manager, Business & Legal Affairs" and a pay raise of $5,000 per year.

22.    However, beginning in or about February 2011 and continuing throughout her tenure, **Plaintiff MACCORMAC was also consistently and continuously sexually harassed and discriminated against by Defendant KLEIN and Defendant STEIN solely due to Plaintiff's gender (female).**

23.    **Defendants subjected Plaintiff MACCORMAC to numerous acts of discrimination and harassment, which created a hostile and intimidating work environment.**

24.    In addition, **Defendants then retaliated against Plaintiff MACCORMAC because Plaintiff MACCORMAC failed to yield to the sexual advances of Defendant KLEIN (*quid pro quo* sexual harassment), and for complaining to Defendants about the sexual harassment.**

25.    By way of background, during Defendant STEIN's tenure as the Interim CEO, while not her job duty, **Defendant STEIN would nonetheless always ask Plaintiff MACCORMAC to sit in front of his office when he was expecting male guests**. In fact, Defendant STEIN would periodically interrupt Plaintiff MACCORMAC's busy workload and ask that she leave her desk, and just sit in front of his office while the male guests were present.  Defendant STEIN knew that Plaintiff MACCORMAC could not perform any work while sitting there, but he didn't care because he **just wanted her to serve as eye-candy for his male guests**.

26.    In or about June 2009, Plaintiff MACCORMAC was working offsite at the house and pool of Joel Schoenfeld (Chief Legal Office & General Counsel), which was a nice treat

4

for the Legal Department in theory but felt very uncomfortable to Plaintiff MACCORMAC who decided beforehand not to even bring her bathing suit. Defendant STEIN, who obviously did not do the Legal Department's work, suddenly showed up unexpectedly, wearing swimming shorts. **He was clearly disappointed to discover them working instead of getting to see Plaintiff MACCORMAC and the other two women wearing bathing suits**, at which point he left shortly after.

27.   Then, on or about March 17, 2010, Defendant STEIN awkwardly offered Plaintiff MACCORMAC a second position as his "Executive Assistant" and further offered to pay her an extra $10,000 a year on top of Plaintiff MACCORMAC's annual salary. Defendant STEIN said he only needed Plaintiff MACCORMAC to sit in front of his office when he had guests arrive and that he had no other work he needed for her to do.

28.   When Plaintiff MACCORMAC realized that **Defendant STEIN was only asking her to be his "Executive Assistant" because she was an attractive female**, Plaintiff MACCORMAC immediately spoke with her supervisors, Joel Schoenfeld (Chief Legal Office & General Counsel) and Sara Marston (Assistant General Counsel), who both agreed that it was inappropriate and strange that Defendant STEIN asked Plaintiff MACCORMAC to be his "Executive Assistant."

29.   In fact, on or about March 17, 2010, Mr. Schoenfeld even said to Defendant STEIN, "**you aren't asking the guy in Finance to go sit in front of your office, so why are you asking [Plaintiff MACCORMAC]?**" It was clear that Defendant STEIN only offered her the position due to her gender. Plaintiff MACCORMAC decided not to accept the position.

30.   In or about December 2010, after Defendants announced that they were relocating their

office, Plaintiff MACCORMAC spoke with Defendant STEIN to express her interest in doing the commissioned artwork for the new location.

31. As Defendant KLEIN was Defendant EMUSIC's new CEO (since August 2010), Defendant STEIN said that Plaintiff MACCORMAC needed to speak with Defendant KLEIN about it, and Defendant KLEIN responded with definite interest in one or two different large-scale painting and sculptural pieces to be determined based on the ultimate location.

32. On or about January 7, 2011, at approximately 5:00 pm, Plaintiff MACCORMAC met with Defendant KLEIN in his office about the commissioned art for new office, during which she presented two (2) different concepts. **Defendant KLEIN said he loved the ideas and was very excited about them**.

33. In addition, Plaintiff MACCORMAC was particularly excited, considering Defendants' previous commissioned artist was paid approximately $15,000.00 to paint a mural.

34. **On or about February 3, 2011, during a meeting with all employees, Defendant KLEIN again praised Plaintiff MACCORMAC, and announced that she was going to do the commissioned art for the new office location**.

35. During this same meeting, Defendant KLEIN also said that he wanted Plaintiff MACCORMAC to take on, and develop, a whole new role (outside of the Legal Dept.) whereby she would be organizing art exhibits and events in the new location. Plaintiff MACCORMAC was very excited about the prospect of this new position and duties.

36. As such, the following day, on or about February 4, 2011, when Defendant KLEIN had asked Plaintiff MACCORMAC to go to dinner with him to discuss the commissioned art, Plaintiff MACCORMAC jumped at the opportunity. While Plaintiff MACCORMAC

thought that going to dinner was rather strange, she figured that Defendant KLEIN was simply being nice, and that he considered her to have great potential.

37.  **However, it was during that meal that Plaintiff MACCORMAC realized that Defendant KLEIN had much more in mind than merely discussing work-related topics**. During dinner, Defendant KLEIN told Plaintiff MACCORMAC numerous times, **"you are gorgeous,"** causing Plaintiff MACCORMAC to feel extremely uncomfortable.

38.  Defendant KLEIN went on to tell Plaintiff MACCORMAC that her good looks must make her intimidating to both men and women. This was especially unexpected coming from Defendant KLEIN, as he was not only the CEO, but was also married, had children, and was around the same age as Plaintiff MACCORMAC's parents.

39.  Shockingly, out of the blue, Defendant KLEIN then told Plaintiff MACCORMAC, **"I am in love with you and have several other restaurants to which I want to take you."** Plaintiff MACCORMAC was extremely shaken by this comment and continually tried to change the subject to work-related topics.

40.  As if it couldn't get any worse, **Defendant KLEIN then asked for Plaintiff MACCORMAC's hand and held it for a moment at the table, while Plaintiff MACCORMAC just sat there stunned and frozen**.

41.  After dinner, Defendant KLEIN walked Plaintiff MACCORMAC to the subway, thanked her for a "special evening," and asked her to text him to let him know that she got home.

42.  **Unfortunately, the unlawful behavior did not end, and from that day forward, Defendant KLEIN repeatedly sexually harassed Plaintiff MACCORMAC.**

43.  On or about February 11, 2011, Defendant KLEIN emailed Plaintiff MACCORMAC, and **again tried to get her to meet him for dinner**, even having the audacity to ask Plaintiff

MACCORMAC if he could go to her apartment to see her artwork in person, to which Plaintiff MACCORMAC politely declined.

44. Although Plaintiff MACCORMAC was extremely upset and disturbed, she figured that if she simply continued to reject Defendant KLEIN's unwanted advances and made sure to never go to dinner with him again, he would stop the inappropriate and illegal behavior. She was wrong.

45. In fact, rather than stopping the unlawful sexual harassment of Plaintiff MACCORMAC, Defendant KLEIN instead escalated the severity of his harassment.

46. On or about February 14, 2011, after Defendant KLEIN and his wife went to an exclusive opening of a big jewelry design exhibit at the Cooper Hewitt Museum, he told Plaintiff MACCORMAC, **"I *wish* I had been there with *you* instead."** Plaintiff MACCORMAC was so disgusted, scared, and intimidated that she just ignored that comment.

47. While Plaintiff MACCORMAC always tried to keep the relationship professional, Defendant KLEIN continued to make inappropriate and discriminatory comments to Plaintiff MACCORMAC.

48. On or about February 16, 2011, when Defendant KLEIN's assistant (Phyllis Werts) returned a contract to Plaintiff MACCORMAC that she had asked Defendant KLEIN to sign, Ms. Werts told Plaintiff MACCORMAC that **"Defendant KLEIN says that you owe him a kiss for signing the contract."** Ms. Werts said this in front of Sara Marston and Fran Mady, at which point Sara Marston said, "that's an HR violation. Legal does not give kisses," to which Ms. Werts responded, "I'm only the messenger."

49. During in or about February 2011, Plaintiff MACCORMAC worked incredibly hard on a large commissioned art piece for the new office that was assigned to her by Defendant

KLEIN. Plaintiff MACCORMAC was working in the office all day, then working on the art pieces all night, hardly sleeping.

50.     Furthermore, **Defendant KLEIN took advantage of the situation and the power he had over Plaintiff MACCORMAC** by constantly suggesting that they have dinner to discuss the various artwork opportunities, and constantly offering to go to Plaintiff MACCORMAC's apartment to help her transport the finished art pieces to the office, which Plaintiff MACCORMAC always rejected.

51.     From in or about February 2011 through in or about June 2011, Defendant KLEIN would constantly stop by Plaintiff MACCORMAC's office in the evening, after everyone had gone home, obviously waiting until she was alone. This was always intimidating to Plaintiff MACCORMAC.

52.     Defendant KLEIN had also said he would arrange meetings with Plaintiff MACCORMAC, Emily Lawrence (the Senior Interactive Art Director) and their Computer Interactive consultant Mark Spates, for the special projects they were discussing, neither of which ever happened.

53.     Defendant KLEIN was always finding ways to keep Plaintiff MACCORMAC on the hook with promised work opportunities, trying to plan dinners and when those were refused, he would push for drinks and then lunch as a last resort. Yet he did not follow through with any of the business plans and projects they met about.

54.     Defendant KLEIN also told Plaintiff MACCORMAC that once the new CMO came onboard, Plaintiff MACCORMAC could begin her new role and transition into that department. However, when the new CMO, Brad Soroca, came on in or about May 2011, nothing happened.

55.    In or about May 2011, Defendant KLEIN convinced Plaintiff MACCORMAC to go out
       to lunch with him for another meeting, and while Plaintiff MACCORMAC arrived with
       outlines of ideas for different projects, Defendant KLEIN just wanted to chat socially,
       **constantly looking her up and down, smiling, and telling her that she was gorgeous**.
       When he picked her up at the legal office for lunch, Fran Mady was there and looked
       shocked to see they had lunch plans together because he was the CEO and not even as her
       superior had she ever been invited for lunch with Defendant KLEIN. It was unusual
       attention. Utterly perplexed, Fran Mady asked Plaintiff MACCORMAC how that
       happened, and Plaintiff MACCORMAC said Defendant KLEIN had invited her.

56.    During this same lunch, Plaintiff MACCORMAC told Defendant KLEIN that she was
       interested in transitioning out of the Legal Department and into another role with greater
       growth potential where she could utilize all her skills by developing cultural projects for
       Marketing, and cultural partnerships for Business Development, thereby increasing her
       professional value inside the company.

57.    In response, Defendant KLEIN enthusiastically agreed but told her, **"not to tell anyone
       about it for now"** because it could take a couple of months for the transition. It soon
       became clear to Plaintiff MACCORMAC that the only reason he didn't want her to tell
       anyone was because he had been insincere and only wanted to postpone the transition,
       enabling him to spend more time with her, inappropriately always trying to meet for
       dinner or drinks.

58.    In or about May 2011, when Plaintiff MACCORMAC met with Defendant KLEIN in his
       office to show him some new photos of her art, he responded by telling Plaintiff
       MACCORMAC, **"you look especially gorgeous today,"** and that **he'd love to go to her**

**apartment** to see them in person. Although Plaintiff MACCORMAC tried to ignore him, he nonetheless repeated it several times. The idea of being alone with Defendant KLEIN was especially frightening to Plaintiff MACCORMAC.

59.    When Plaintiff MACCORMAC didn't respond or acknowledge his statement, Defendant KLEIN pressed on, forcefully trying to schedule a time for him to visit Plaintiff MACCORMAC at her apartment. This was a whole new level of obsession, and really started to scare Plaintiff MACCORMAC. He was acting out of control, pathologically determined to get what he wanted, like a predator. Plaintiff MACCORMAC actually began to sense that he was a danger to her. When Plaintiff MACCORMAC left his office, she realized fully that he was not serious about any of the opportunities they had ever discussed concerning the commissioned art, and that he was just trying to take advantage of his authority to get in a position to sexually harass Plaintiff MACCORMAC.

60.    **On or about May 20, 2011, Plaintiff MACCORMAC could no longer endure the constant sexual harassment, which was only increasing in severity, and as such, complained to her supervisor (Sara Marston) about Defendant KLEIN's unlawful behavior and sexual harassment**. Sara Marston was horrified at what she heard and told Plaintiff MACCORMAC that this was very serious.

61.    Beginning on or about May 25, 2011, Defendant KLEIN began to constantly walk by Plaintiff MACCORMAC's office and just stare at her.

62.    In or about June 2011, Sara Marston resigned from her position at Defendant EMUSIC.

63.    In or about June 2011, Defendant KLEIN emailed Plaintiff MACCORMAC on her personal email and asked to meet her for coffee "to check in." In response, Plaintiff MACCORMAC agreed to meet with him at the office, and requested that Defendant

KLEIN only use her work email address to contact her going forward.

64. In this meeting, Plaintiff MACCORMAC asked him for the status of the commissioned art projects. Shockingly, Defendant KLEIN notified Plaintiff MACCORMAC for the first time, that he **"would not be spending the investors' money on that because it did not directly lead to profits."**

65. As Defendant KLEIN had previously always indicated that it was a sure thing, it was rather apparent that Defendant KLEIN was now removing these projects from Plaintiff MACCORMAC solely in retaliation for rejecting his sexual advances and for complaining about his sexual harassment.

66. In or about July 2011, Defendant STEIN admired a necklace worn by Plaintiff MACCORMAC, and knowing that she designed jewelry, asked her to make him some custom jewelry for his wife and two (2) daughters. Plaintiff MACCORMAC was obviously pleased at the recognition and opportunity.

67. Defendant STEIN thereafter brought Plaintiff MACCORMAC to a conference room to discuss his custom order. Surprisingly, out of nowhere, he asked her what her ultimate job or profession would be, if she could be doing anything, regardless of obstacles? Plaintiff MACCORMAC was confused and said that was a bit tricky to answer considering that she was currently working for him. He said not to worry about that and again asked, "What's your dream? **Let's get you out of your day job."** She laughed at the obvious conflict of interest for him to suggest helping her leave his employment, although it sounded great to Plaintiff MACCORMAC for the chairman of the company, a varied businessman and investor, to be interested in launching/backing her professional dreams. Plaintiff MACCORMAC felt like Defendant STEIN believed in her talents,

abilities and worthwhile after knowing her professionally for several years.

68.    As such, Plaintiff MACCORMAC shyly answered that her ultimate dream was to be an artist exhibiting paintings and sculpture in galleries, and to also do custom jewelry design. Defendant STEIN said he wanted to introduce Plaintiff MACCORMAC to his close family friend, Carolee Friedlander, who is a hugely successful businesswoman in the jewelry industry. He invited Plaintiff MACCORMAC for a future visit to Greenwich, CT to meet Carolee and hopefully convince her to potentially mentor Plaintiff MACCORMAC, invest $100k in a company for her, and introduce her to contacts in the industry, including all the big buyers and manufacturers.

69.    Plaintiff MACCORMAC was so honored to have Defendant STEIN, the big shot of the company, be so confident in her. She had never even approached Defendant STEIN for any of this. All she could do was thank him for the support, as it meant so much to her.

70.    Defendant STEIN said they just needed to wait until summer ended to arrange a meeting with Carolee. At the time, **Plaintiff MACCORMAC did not realize that this was just another tactic for Defendant STEIN to act like he was being considerate and generous, when really he was being manipulative, tricking her into being locked in a secret with him, trying to create a situation which would make Plaintiff MACCORMAC feel indebted to him, all with the hopes it would keep her away from ever pursuing legal action against them for sexual harassment and retaliation.**

71.    In or about August 2011, Defendants hired Defendant TIERNEY as the "Chief Human Resources Officer."

72.    On or about August 20, 2011, Mr. Schoenfeld, (now serving as outside counsel and still a minority shareholder in the company), held another pool party at his house in CT for the

13

employees in the Legal & Licensing Departments that used to report to him when he was still in-house counsel. As always, only women were invited.

73.   In fact, Plaintiff MACCORMAC even suggested to Mr. Schoenfeld that the male employee from Licensing that he excluded be included as well, to which Mr. Schoenfeld made a face and said, **"I don't want to invite him. I don't really want to see him in a bathing suit. And it's my house so I can do whatever I want."** Plaintiff MACCORMAC made sure not to bring a bathing suit this time either because she felt too uncomfortable with the situation. When at the party, Mr. Schoenfeld kept teasing Plaintiff MACCORMAC for not bringing a bathing suit, suggesting that she borrow one from his daughter, which Plaintiff MACCORMAC politely declined.

74.   In or about September 2011, Maia Spilman replaced Sara Marston as Defendants' Assistant General Counsel.

75.   On or about September 28, 2011, the day after Plaintiff MACCORMAC took off for Rosh Hashanah, Maia Spilman began to interrogate Plaintiff MACCORMAC, stating that Defendant KLEIN wanted to know why she was absent the previous day.

76.   Fran Mady overheard Ms. Spilman and acknowledged to Plaintiff MACCORMAC that it would obviously be retaliation for Defendant KLEIN to be singling Plaintiff MACCORMAC out and having Ms. Spilman come talk with her. **While Fran Mady had just been out of the office for a few days, Defendant KLEIN never asked about her whereabouts.**

77.   A couple of days later, **Plaintiff MACCORMAC complained to Mr. Schoenfeld about Defendant KLEIN's sexual harassment,** during which Plaintiff MACCORMAC told him that Defendant KLEIN was singling her out and retaliating against her for not

engaging in sexual relations with him, and because she reported his inappropriate behavior.  Mr. Schoenfeld said he knew about the sexual harassment already since the time it had been reported several months earlier.

78.     Shockingly, Mr. Schoenfeld responded by telling Plaintiff MACCORMAC several times that Defendant STEIN would be very angry with her if and when he heard that she was reporting Defendant KLEIN's retaliation, and that Defendant STEIN has a real bad temper.  Although Plaintiff MACCORMAC was utterly terrified by this threat, she felt she had no choice but to complain to Defendant EMUSIC's Human Resources as well.

79.     **On or about October 5, 2011, Plaintiff MACCORMAC complained to Defendant TIERNEY about Defendant KLEIN's obvious retaliation relating to the Rosh Hashanah incident.**

80.     Defendant TIERNEY immediately started to defend Defendant KLEIN, saying that he has known him for many years, and actually tried to dissuade Plaintiff MACCORMAC from formally reporting the incident, by telling her to think about it, and that if she still wanted to report the incident in a week, that they could meet again at that time.  Plaintiff MACCORMAC was shocked, and was firm that she wanted to formally report it that day. She could not believe that this was how Defendant TIERNEY conducted himself considering that he was HR. It was surreal.

81.     **It was at this time that Plaintiff MACCORMAC learned that two (2) or three (3) other female employees had complained of similar experiences relating to Defendant KLEIN's inappropriate behavior.**  Apparently, Defendant KLEIN thought his position of authority granted him a pool of female employees for his manipulation and womanizing because he could command their attention. He acted like a sexual predator

15

through and through.

82.   On or about October 9, 2011, Defendant KLEIN sent Plaintiff MACCORMAC an email while on vacation in Toronto with his family no less, about a project in which he acknowledged the opportunities that had been long promised to Plaintiff MACCORMAC in the Marketing Department, a position which inherently provided greater growth potential, pay, and opportunities than Plaintiff MACCORMAC's current position in the Legal Department.

83.   Defendant KLEIN also said he would arrange a meeting for Plaintiff MACCORMAC and Prateek Sarkar (VP of User Experience & Design in Marketing Dept.) for the project. It was obvious to Plaintiff MACCORMAC that Defendant TIERNEY spoke with Defendant KLEIN about Plaintiff MACCORMAC's sexual harassment complaint, contrary to what he had told Plaintiff MACCORMAC he would do.  However, Defendant KLEIN never set up this meeting and never even spoke to Mr. Sarkar.

84.   On or about October 19, 2011, after Defendant KLEIN returned from Toronto, he told Plaintiff MACCORMAC that he was **"willing to have the company fly her out to Toronto to see the exhibit."** This was just another pathetic failed attempt to get Plaintiff MACCORMAC alone with him.

85.   Subsequently, when **Plaintiff MACCORMAC complained to Mr. Schoenfeld about the sexual harassment**, he responded, "you know they can't help themselves, those guys (Defendant STEIN & Defendant KLEIN) are just in love with you."  This actually became an ongoing joke for Mr. Schoenfeld, whereby he would tease Plaintiff MACCORMAC that, **"Defendant STEIN & Defendant KLEIN are both in love with you."** . Plaintiff MACCORMAC would always ask Mr. Schoenfeld to please not joke

about that, but Mr. Schoenfeld loved making Plaintiff MACCORMAC feel uncomfortable.

86. Mr. Schoenfeld then told Plaintiff MACCORMAC that Defendant STEIN was not permitting them to conduct an internal investigation into Defendant KLEIN's unlawful behavior regarding the retaliation and discrimination she had experienced since reporting the sexual harassment.

87. Moreover, Plaintiff MACCORMAC also complained to her direct supervisor, Fran Mady, about Defendant KLEIN's inappropriate and illegal behavior, who was sympathetic to her obviously horrible situation but who could do nothing considering that Defendant KLEIN is her direct supervisor and the CEO of the company. Besides, Plaintiff MACCORMAC already notified both Defendant TIERNEY and Mr. Schoenfeld who was Ms. Mady's legal superior.

88. On or about October 19, 2011, after the Rosh Hashanah retaliation incident and subsequent complaint by Plaintiff MACCORMAC to Fran Mady, Joel Schoenfeld and Defendant TIERNEY, Plaintiff MACCORMAC was left to feel so estranged without any assistance or protection.

89. On the same day she was due to meet with Defendant KLEIN, Defendant STEIN emailed Plaintiff MACCORMAC, checking in on her and prodding her again to send him her art and jewelry biography for Carolee. Plaintiff MACCORMAC was surprised that Defendant STEIN was still offering to make that connection considering Plaintiff MACCORMAC had just reported the retaliation which Mr. Schoenfeld had warned would infuriate Defendant STEIN.

90. Originally, Defendant STEIN had told her that they (STEIN, MACCORMAC, and

17

Carolee) would all meet in Greenwich, CT. Then later, he said Plaintiff MACCORMAC should email him her biography and photos for him to forward to Carolee in advance of the meeting. And ultimately, he told Plaintiff MACCORMAC to write him an email instead, directing her to include an opening message requesting to meet Carolee, so he could forward that to Carolee. At that point, Plaintiff MACCORMAC felt uncomfortable, as Defendant STEIN was manipulating Plaintiff MACCORMAC's introduction to Carolee to make it appear as if it were upon Plaintiff MACCORMAC's request rather than upon his invitation and prodding, while Plaintiff MACCORMAC had actually never even heard of Carolee prior to Defendant STEIN's mentioning of her.

91. When Plaintiff MACCORMAC and Carolee were finally put in direct contact, it quickly became apparent to Plaintiff MACCORMAC that Carolee had little interest in the introduction. Carolee rejected an in person meeting, only availing herself for a brief phone call while in transit on or about November 12, 2011.

92. Perplexed by the whole production Defendant STEIN had orchestrated, Plaintiff MACCORMAC emailed Defendant STEIN afterwards about the uneventful call with Carolee, after which Defendant STEIN avoided Plaintiff MACCORMAC for a period of time, clearly not wanting to discuss the matter. The whole thing was a weird "carrot and stick" mirage, as if to make Plaintiff MACCORMAC perceive Defendant STEIN as a "good guy."

93. Meanwhile, regardless of layoffs, there have been endless consultants hired for each department, predominantly the one into which Plaintiff MACCORMAC was supposed to be transitioning (Marketing/Business Development). **It was apparent to Plaintiff MACCORMAC that Defendant KLEIN was doing anything he could to get back at**

18

**her and to hold her down professionally, with the goal of driving her out of the company since he could not fire her because Plaintiff MACCORMAC's previous complaints would make it obvious retaliation.**

94. On or about December 15, 2011, while walking to the company holiday party with a small group including Defendant STEIN, Plaintiff MACCORMAC jokingly said she would love to win the raffle's grand prize, a flat screen TV, because everyone knew Defendant STEIN conducted the drawing of the winners' names. When it came time for the raffle and Defendant STEIN announced Plaintiff MACCORMAC as the grand-prize winner, she was incredibly surprised and excited. A bit gullible about the uncanny coincidence and still in shock, she politely went to thank Defendant STEIN who pulled her aside from the crowd of people and said, **"We take care of those who deserve it."** Plaintiff MACCORMAC could not believe that Defendant STEIN actually falsified her winning and was using it as leverage with her. It was then that Plaintiff MACCORMAC started to truly comprehend how manipulative Defendant STEIN was being with her, all the while wearing a friendly face, by trying to make her feel "special" and indebted to him for something he needed in return, her silence. Plaintiff MACCORMAC felt her loyalty and naïveté were being grossly taken advantage of by Defendant STEIN.

95. Ever since the sexual harassment came to light, Mr. Schoenfeld would constantly tell Plaintiff MACCORMAC she had nothing to worry about because "they" would never fire her. However, his reassurances only served to remind her that she was stigmatized and that she was now only viewed as someone who recently complained of sexual harassment. As the Defendants' legal counsel, it was clear that Mr. Schoenfeld had advised Defendants against firing Plaintiff MACCORMAC because it would give her a

19

strong claim for unlawful retaliation.

96. **As a result, Mr. Schoenfeld began to push Plaintiff MACCORMAC to leave voluntarily by mocking the company, saying that it was an undesirable place to work.** Mr. Schoenfeld often told Plaintiff MACCORMAC he thought Defendant STEIN should fire Defendant KLEIN but that Defendant STEIN would not do it. Plaintiff MACCORMAC felt pressured and scared at being told she should leave. Mr. Schoenfeld even suggested to transfer her to their sister company, The Orchard. She told him that was not fair, as she was the victim of sexual harassment and the one who complained.

97. Mr. Schoenfeld continued to urge Plaintiff MACCORMAC to give him her resume so he could try to help her get a different job. It was like he was trying to usher her out, which caused her a great deal of anxiety, all while acting like her friend. Though she thanked him, Plaintiff MACCORMAC did not give him her resume, as it was abundantly clear that Mr. Schoenfeld was continuously trying to use his close ties to Plaintiff MACCORMAC and the trust he had gained to convince Plaintiff MACCORMAC to quit.

98. On or about January 8, 2012, as Plaintiff MACCORMAC had been suffering from extreme stress and anxiety for months, she knew she could not continue with things the way they were anymore, and as a result, emailed Defendant STEIN to request a meeting.

99. **On or about January 10, 2012, Plaintiff MACCORMAC met with Defendant STEIN** in his office and told him that she just couldn't handle the harassment, discrimination, and retaliation any longer, and actually broke down in tears.

100. On or about January 13, 2012, when Plaintiff MACCORMAC emailed Defendant STEIN to follow up on their meeting from a few days earlier, Defendant STEIN wrote back manipulatively stating he was sad to see that she was "resigning." Plaintiff

MACCORMAC immediately responded informing him that she never said that she was resigning and was actually not resigning, to which Defendant STEIN apologized.

101. On or about January 17, 2012, Plaintiff MACCORMAC again met with Defendant STEIN and explained that although she has been pleading with them to address this blatant harassment and retaliation, Defendants had still done nothing in response to any of these complaints, allowing a hostile work environment to continue and escalate.

102. **In response, Defendant STEIN offered Plaintiff MACCORMAC an extremely low severance payment to voluntarily resign from her position.** When Plaintiff MACCORMAC rejected the offer, Defendant STEIN became extremely aggressive, acknowledging that they knew Defendant KLEIN had sexually harassed Plaintiff MACCORMAC, and telling her to go ahead and file a lawsuit. Plaintiff MACCORMAC was shocked at how hostile the workplace environment had become, and had nowhere else to turn for help.

103. On or about January 18, 2012, Mr. Schoenfeld sent Plaintiff MACCORMAC an email with no message, but with the subject line, **"What is Hebrew for 'go fuck yourself?'"** Plaintiff MACCORMAC was still reeling from the belligerent meeting with Defendant STEIN the day before, only to receive that jarring email from their legal counsel right after.

104. On or about January 24, 2012, Plaintiff MACCORMAC noticed that Fran Mady was drafting and negotiating Defendants' Non-Disclosure Agreements, something that had always been Plaintiff MACCORMAC's responsibility.

105. When Plaintiff MACCORMAC asked Ms. Mady why there was a change to her work responsibilities, Ms. Mady said that Defendant KLEIN instructed her to do it. Ms. Mady

was reluctant to discuss the instructions from Defendant KLEIN so as to follow orders from her supervisor to keep it confidential. **Now, not only are all the many promised advancement opportunities being denied to Plaintiff MACCORMAC, but even the basic responsibilities she'd had for years in Defendants' Legal Department are being taken away**.

106.   Furthermore, Plaintiff MACCORMAC was then excluded from being involved in a due diligence project, which she had always been a participant in the past. Once again, Defendants ordered that Plaintiff MACCORMAC be excluded and denied basic responsibilities as a form of retaliation for constantly complaining of sexual harassment and retaliation.

107.   On or about February 28, 2012, Defendant TIERNEY emailed Plaintiff MACCORMAC and requested that she come to his office for a meeting at 5:30 pm to address the "workplace environment." Knowing that Human Resources meetings are usually only set for the end of the day if someone is going to be terminated, Plaintiff MACCORMAC was scared for her job. As Plaintiff MACCORMAC already felt intimidated by Defendant TIERNEY from the Rosh Hashanah incident, she asked if Fran Mady, her direct supervisor (who is also the company's in-house lawyer), could sit in on the meeting. Defendant TIERNEY wholly refused Plaintiff MACCORMAC's request, clearly a further attempt to intimidate, isolate and harass Plaintiff MACCORMAC.

108.   When Plaintiff MACCORMAC arrived at the meeting, Defendant TIERNEY was furious, **telling Plaintiff MACCORMAC that he was aware of her recent complaints of discrimination, but that Plaintiff MACCORMAC still had to be respectful of all employees, including Defendant KLEIN.**

109.   Defendant TIERNEY continued, claiming that he witnessed Plaintiff MACCORMAC
       ignore Defendant KLEIN when he said hello to her when passing in the hallway.
       Moreover, Defendant TIERNEY raised his voice and became highly aggressive and
       hostile, saying that disrespect would not be tolerated against any of their employees,
       including Defendant KLEIN.  Plaintiff MACCORMAC was stunned and did not even
       know to what he was referring, to which Defendant TIERNEY couldn't even give any
       specifics.

110.   **It was clear to Plaintiff MACCORMAC that Defendant TIERNEY was lying about
       having witnessed any such incident and that he was just trying to harass and
       intimidate Plaintiff MACCORMAC in retaliation for complaining about Defendant
       KLEIN, his old friend who hooked him up with his job and to whom he reported.**

111.   Plaintiff MACCORMAC told Defendant TIERNEY it felt like she was getting
       reprimanded for not saying hello to the person who sexually harassed her and retaliated
       against her.  Defendant TIERNEY continued to scold Plaintiff MACCORMAC, telling
       her to make no mistake – she was getting reprimanded.  Plaintiff MACCORMAC could
       not believe that she was being reprimanded, and by HR at that, for failing to be more
       social with Defendant KLEIN, the same person who was sexually harassing her.

112.   Rather surprisingly, Defendant TIERNEY then said that her work was excellent and she
       was a great employee, but disrespect would not be tolerated, to which Plaintiff
       MACCORMAC replied that she felt she was the one being disrespected and treated
       unfairly.

113.   On or about February 29, 2012, Plaintiff MACCORMAC's attorney sent a letter to
       Defendants concerning Defendants' continued discriminatory and unlawful actions to

23

which Plaintiff MACCORMAC was being subjected.  While Plaintiff MACCORMAC was hoping that this letter would finally put an end to the hostile work environment, she was wrong.

114.   On or about March 13, 2012, Defendant TIERNEY emailed Plaintiff MACCORMAC and again instructed her to come to his office with Meagan Breen, Defendants' Manager of Human Resources.  This time he spoke in a calm and professional manner, which did not surprise Plaintiff MACCORMAC.  She knew he could not be as hostile as last time considering that someone else was in the meeting with them this time, which is exactly why she had requested Fran Mady's attendance that time.

115.   When Plaintiff MACCORMAC arrived, **Defendant TIERNEY tried to dissuade Plaintiff MACCORMAC from moving forward with a lawsuit, and further attempted to convince Plaintiff MACCORMAC to try and resolve all of her issues without her attorney because "it would be more humane."**  Plaintiff MACCORMAC was shocked that Defendants were actually making active efforts to interfere with, and stop, Plaintiff MACCORMAC from exercising her rights under anti-discrimination laws.

116.   Defendants have not made any attempt to discuss any of Plaintiff MACCORMAC's concerns and/or complaints.

117.   **Thus, Defendants are discriminating against and retaliating against Plaintiff MACCORMAC because she failed to yield to the sexual advances of Defendant KLEIN (*quid pro quo* sexual harassment), and in retaliation for her opposition to Defendant KLEIN's unlawful employment practices.**

118.   Plaintiff MACCORMAC feels offended, disturbed, anxious, stressed, and humiliated by this blatantly unlawful retaliation.  She has been betrayed, abused and persecuted.

119. Plaintiff MACCORMAC is being retaliated against due to her opposition to Defendant KLEIN's sexually harassing and unlawful conduct.

120. The above are just some of the acts of harassment, discrimination and retaliation that Plaintiff MACCORMAC experiences on a regular and continual basis while employed by Defendants.

121. **Defendant KLEIN treats Plaintiff MACCORMAC differently (sexually harasses and propositions) solely because she is a female.**

122. **But for the fact that Plaintiff MACCORMAC is a female, Defendant KLEIN would not be treating her differently (sexually harassing and propositioning).**

123. **But for the fact that Plaintiff MACCORMAC rejected Defendant KLEIN's sexual advances, Defendants would not have denied her the commissioned art projects, as well as other professional advancements in the Marketing Department.**

124. Defendant KLEIN's actions were and are unsolicited, unwelcome and offensive.

125. Defendants' actions and conduct were intentional and intended to harm Plaintiff MACCORMAC.

126. Plaintiff MACCORMAC is regularly exposed to a sexually offensive and hostile work environment by Defendant KLEIN and Defendant STEIN, who are both her superiors.

127. Plaintiff MACCORMAC has been unlawfully discriminated against, humiliated, retaliated against, degraded and belittled, and as a result, suffers loss of rights, emotional distress, loss of income, earnings and physical injury.

128. Plaintiff MACCORMAC's performance has been, upon information and belief, above average during the course of her employment with Defendants.

129. As a result of Defendants' actions, Plaintiff MACCORMAC feels extremely humiliated,

degraded, victimized, embarrassed, and emotionally and physically distressed.

130. As a result of the Defendants' discriminatory and intolerable treatment of Plaintiff, Plaintiff has suffered severe emotional distress and physical ailments.

131. As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of income, the loss of a salary, bonus, benefits, and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

132. As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdiction limits of the Court.

133. Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Plaintiff demands Punitive Damages as against all Defendants, jointly and severally.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII
### (Not Against Individual Defendants)

134. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

135. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., for relief based upon the unlawful employment practices of the above-named Defendants. Plaintiff complains of Defendants' violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's gender (sexual harassment).

136.  Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against Plaintiff because of her gender (sexual harassment).

## AS A SECOND CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII
### (Not Against Individual Defendant)

137.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

138.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be unlawful employment practice for an employer:

"(1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

139.  Defendants engaged in unlawful employment practice prohibited by 42 U.S.C. §2000e et seq. by discriminating against Plaintiff with respect to the terms, conditions or privileges of employment because of her opposition to the unlawful employment practices of Defendants.

## AS A THIRD CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

140.  Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

141.  The Administrative Code of City of NY § 8-107 [1] provides that, "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender,

disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

142.   Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff because of her gender (sexual harassment).

## AS A FOURTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

143.   Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

144.   The New York City Administrative Code Title 8, §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

145.   Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

## AS A FIFTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

146.   Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

147. The New York City Administrative Code Title 8, §8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

148. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(7) by discriminating against Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

## AS A SIXTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

149. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

150. New York City Administrative Code Title 8-107(19) Interference with protected rights. It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

151. Defendants violated the section cited herein as set forth.

## AS A SEVENTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

152. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

153. New York City Administrative Code Title 8-107(13) Employer liability for discriminatory conduct by employee, agent or independent contractor.

    a.  An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

    b.  An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

        1.  the employee or agent exercised managerial or supervisory responsibility; or

        2.  the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

        3.  the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

    c.  An employer shall be liable for an unlawful discriminatory practice committed by a person employed as an independent contractor, other than an agent of such employer, to carry out work in furtherance of the employer's business enterprise only where such discriminatory conduct was committed in the course of such

employment and the employer had actual knowledge of and acquiesced in such conduct.

154.   Defendants violated the section cited herein as set forth.

## JURY DEMAND

155.   Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et. seq.*, and the New York City Administrative Code, §8-107 *et. seq.*, in that Defendants sexually harassed Plaintiff, discriminated against Plaintiff on the basis of her gender, and retaliated against Plaintiff for objecting to and complaining about Defendants' sexual harassment;

B. Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and retaliation and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action;

31

F.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just and

proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
        June 26, 2012

                                        PHILLIPS & PHILLIPS,
                                        ATTORNEYS AT LAW, PLLC


                        By:     _____
                                William K. Phillips, Esq. (wp0409)
                                *Attorneys for Plaintiff*
                                30 Broad Street, 35th Floor
                                New York, New York 10004
                                (212) 248-7431
                                tpglaws@yahoo.com

EEOC Form 161-B (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Aimee MacCormac<br>240 Broadway #401<br>Brooklyn, NY 11211 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2012-01766 | Roxanne Zygmund,<br>Investigator | (212) 336-3764 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Kevin J. Berry*                              *June 1, 2012*
**Kevin J. Berry,**                          *(Date Mailed)*
**District Director**

Enclosures(s)

cc:
Director
Human Resources
EMUSIC.COM INC
39 West 13th Street
New York, NY 10011

William Phillips
PHILLPS & PHILLIPS ATTORNEYS AT LAW
30 Broad Street, 35th Floor
New York, NY 10004

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

AIMEE MACCORMAC,

                              Plaintiff,

              -against-

ADAM KLEIN, *Individually*, DANIEL C. STEIN,
*Individually*, DWIGHT TIERNEY, *Individually*,
and EMUSIC.COM, INC.,


                              Defendants.
-------------------------------------------------------------------X


---

## COMPLAINT

---

# PHILLIPS & PHILLIPS

**Attorneys at Law PLLC**
**Attorneys for Plaintiffs**
**30 Broad Street, 35th Floor**
**New York, NY 10004**
**(212) 248-7431**